

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 19 APR 2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

PHYLLIS MOLCHATSKY AND
STEVEN SCHNEIDER,

        Plaintiffs,

    -v-                                   No.  09 Civ. 8697 (LTS)(AJP)

UNITED STATES OF AMERICA,

        Defendant.

------------------------------------------------------x

### OPINION AND ORDER

APPEARANCES:

| | |
|---|---|
| HERRICK, FEINSTEIN LLP<br>  By:  Howard Elisofon, Esq.<br>      Christopher J. Sullivan, Esq.<br>      John Oleske, Esq.<br>      Kerry K. Jardine, Esq.<br>2 Park Avenue<br>New York, NY 10016<br><br>*Counsel for Plaintiffs* | PREET BHARARA<br>United States Attorney<br>Southern District of New York<br>  By: Sarah S. Normand<br>     Assistant United States Attorney<br>86 Chambers St., Third Floor<br>New York, NY 10007<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE<br>  By: Tony West<br>     Assistant Attorney General<br>  By: Phyllis J. Pyles<br>     Director, Torts Branch<br>  By: Mary M. Leach<br>     Assistant Director, Torts Branch<br>  By: Jeffrey Paul Ehrlich, Esq.<br>     Trial Attorney, Torts Branch<br>Benjamin Franklin Station<br>Post Office Box 888<br>Benjamin Franklin Station<br>Washington, DC 20044<br><br>*Counsel for Defendant* |

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE:

Plaintiffs Phyllis Molchatsky ("Molchatsky") and Steven Schneider ("Schneider") (collectively, "Plaintiffs") bring suit against Defendant United States of America ("Defendant" or "the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, alleging gross negligence by the Securities and Exchange Commission ("SEC") and its agents and employees in their oversight, investigations, and examinations of Bernard Madoff ("Madoff") and his firm, Bernard L. Madoff Investment Securities LLC ("BLMIS").[1]  Pending before the Court is Defendant's motion to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  Plaintiffs assert that the Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b).  For the following reasons, Defendant's motion is granted.

## BACKGROUND

Plaintiffs, who allege that they suffered losses in connection with the notorious Ponzi scheme operated by Madoff and BLMIS, seek to recover damages from the United States on the ground that the SEC failed, despite numerous tips, warnings and putative investigations, to discover, disclose and put an end to the scheme from 1992 until 2008.  The allegations contained in the Complaint are derived substantially from the SEC Office of Inspector General's 457-page Report entitled "Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version" ("the OIG Report"), which was released on August 31 2009,

---

[1]     Plaintiffs have complied with the FTCA requirement that a "tort claim against the United States . . . be . . . presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C.A. § 2401(b) (West 2006). See Compl. ¶¶ 20-23.

and is attached to the Complaint as Exhibit A.[2]  The following facts are derived from the

allegations of the Complaint, which are taken as true for purposes of Defendant's motion

pursuant to Rule 12(b)(1).

The Court presumes familiarity with the Complaint and the voluminous

documents on which it relies and summarizes here the specific allegations only to the extent

necessary.[3]  Between 1992 and 2008, the SEC received numerous detailed, credible complaints

regarding Madoff and BLMIS.  (Compl. ¶ 1.)  The investigations and examinations of Madoff

and BLMIS that were undertaken by the SEC in response to these complaints were flawed in

numerous respects.  (Id. ¶¶ 1-2.)  As a result of the SEC's actions and inactions, Madoff's

scheme continued and expanded, eventually resulting in billions of dollars in losses by investors,

and directly causing Plaintiffs more than $2.4 million in losses.  (Id. ¶ 2.)

Between 1992 and 2008, the SEC received at least eight complaints indicating

that Madoff was operating a Ponzi scheme.  (Id. ¶ 5.)  In response, the SEC conducted four

formal investigations or examinations.  (Id.)

The OIG Report revealed multiple and various failures of SEC staff that allowed

the Madoff scheme to continue undiscovered, notwithstanding the complaints and investigations.

(Id. ¶ 12.)  The OIG Report concluded that, despite numerous red flags raised with the SEC, the

---

[2]  The OIG Report "relied on the OIG's extensive review of documents and sworn testimony obtained from numerous current and former SEC employees, email and document searches, document requests to third parties, and a team of experts and consultants with unique and specialized experience."  (Compl. ¶1 n.2.)

[3]  The facts and circumstances of Madoff's fraud have been outlined elsewhere previously.  See In re Bernard L. Madoff Inv. Secs. LLC, 424 B.R. 122, 127-32 (Bkrtcy. S.D.N.Y. 2010) and Dichter-Mad Family Partners, LLP v. United States, 707 F. Supp. 2d 1016, 1020-24 (C.D. Cal. 2010).

SEC never took the "necessary and basic steps to determine if Madoff was misrepresenting his trading." (Id. ¶ 13, quoting OIG Report at 456.) The OIG Report concluded that the SEC's investigations were conducted by inexperienced staff and that their scope and execution were deeply flawed. (Id. ¶ 13.) The OIG found that there was a "systematic breakdown in the manner in which the SEC conducted its examinations and investigations." (Id., quoting OIG Report at 457.)

The SEC negligently performed its 1992 investigation into a firm known as Avellino & Bienes, the investments of which Madoff had complete control, and which touted 100% safe investments. (Id. ¶¶ 32-34.) The SEC team assembled to conduct the investigation was inexperienced and the investigation was limited in scope, failing to verify information by using third parties or to obtain records from sources other than Madoff himself. (Id. ¶¶ 35-38.) The team took no action regarding suspicious information provided to them by Madoff. (Id. ¶¶ 39-41.) The negligent conduct of, and failure to follow the leads presented by, the Avellino & Bienes investigation lead the SEC to miss an early opportunity to discover Madoff's Ponzi scheme. (Id. ¶¶ 42-44.) When Plaintiff Schneider invested with Madoff in June 1997, he did not know that the SEC had conducted its Avellino & Bienes investigation the way it had. (Id. ¶¶ 45-46.)

In May 2000, a complaint, including evidence and analysis, regarding Madoff's returns was filed by an industry analyst and Certified Fraud Examiner, Harry Markopolos ("Markopolos"). (Id. ¶ 47.) The resulting SEC investigation assigned the case to an unqualified staff member in its Boston office who lacked a basic understanding of finance, who also failed to forward the complaint to the SEC's New York office despite his claims that he had. (Id. ¶¶ 49-

51.)

In March 2001, Markopolos filed a second complaint with the SEC's Boston
office regarding Madoff's returns versus the S&P 500.  (Id. ¶ 52.)  This complaint contained
evidence and analysis in addition to that presented by Markopolos' May 2000 complaint.  (Id. ¶¶
52-53.)  The March 2001 complaint was forwarded to the New York office, which promptly
decided not to investigate its claims.  (Id. ¶ 54.)  The staff member in New York who declined to
investigate did so without consultation with other, more experienced staff members.  (Id. ¶¶ 45-
46.)

In May 2001, the industry publications *MARHedge* and *Barron's* publicly
questioned Madoff's operations and returns.  (Id. ¶¶ 56-59.)  In response to a query from a staffer
at the SEC's Boston office, a staffer at the New York office expressed no interest in the *Barron's*
article questioning Madoff's operations, and the OIG Report found no evidence that anyone at
the New York office reviewed the relevant article prior to 2005.  (Id. ¶ 60.)  A staffer in the
Washington office noticed the *Barron's* article but took no action after having read it.  (Id. ¶ 61.)
In late 2001, Molchatsky invested with Madoff.  (Id. ¶ 63.)

In May 2003, the SEC's Washington Investment Management team received a
detailed complaint, which included extensive documentation and pointed out numerous red flags,
against Madoff from a reputable hedge fund manager.  (Id. ¶¶ 64-65.)  The Washington SEC
office referred the complaint to its Broker-Dealer team despite the team's lack of experience with
Ponzi schemes or investment-management issues.  (Id. ¶ 67.)  Due to an atmosphere of jealousy
and secrecy, the Broker-Dealer team never conferred with the Investment Management team for
support or information concerning the complaint.  (Id. ¶ 68.)  The investigation was conducted by

a team that lacked adequate training or knowledge of the relevant financial industry. (Id. ¶¶ 69-70.)  The inexperienced team began its investigation seven months after receiving the complaint by looking into "front-running" rather than into the allegations that Madoff was running a Ponzi scheme. (Id. ¶¶ 71-73.)  The single plan of investigation that was actually responsive to the allegations that had been made in the complaint was never executed because doing so presented the possibility of needing to review a volume of documents that was considered "burdensome." (Id. ¶¶ 74-76.)  During the investigation, junior team members realized that Madoff was lying to the SEC, but his answers were continually relied upon, and were never verified with third parties or independent sources.  (Id. ¶¶ 78-81.)  The investigation team declined even to ask Madoff himself for certain documents that would have exposed his fraud because the documents would have been voluminous and their review would have been time-consuming.  (Id. ¶¶ 82-83.)  In April 2004, the team investigating the May 2003 complaint was directed to cease its efforts so that resources could be directed elsewhere.  (Id. ¶ 84.)  The investigation was never formally concluded, and a final report was never produced, nor was a case-opening report entered into the SEC's case-management system.  (Id. ¶¶ 84, 86.)  The OIG Report found the investigation into the May 2003 complaint to be deficient in a number of significant respects.  (Id. ¶ 87.)

In April 2004, an investigation being conducted by the SEC's New York office into a firm unrelated to Madoff revealed internal emails that raised questions about whether Madoff was engaged in illegal activity.  (Id. ¶ 88.)  The emails contained some of the same information that had been presented in the complaints from Markopolos and the public news stories that questioned Madoff's legitimacy.  (Id. ¶ 90.)  In response to these emails, and after a delay of ten months, a Broker-Dealer team in the New York office began investigating Madoff.

(Id. ¶ 93.)  The investigative team failed to draft a planning memorandum to guide their investigation, and again focused its investigation on "front-running."  (Id. ¶¶ 93-94.)  Like the earlier investigation, this investigation was driven by the knowledge base of the team rather than the allegations of the complaint.  (Id. ¶¶ 94-95.)  The investigation again involved asking Madoff questions and accepting his answers, even those that made staff members suspicious, at face value without verification of any kind.  (Id. ¶¶ 96-102.)  When junior staff members eventually expressed a desire to verify Madoff's answers, they were vetoed by senior staff members who claim to have believed that such verification could result in personal liability.  (Id. ¶¶ 103-04.)  The only verification attempt that the New York team conducted, and which revealed that Madoff had lied to investigators, was not inquired about further and did not result in further verification attempts.  (Id. ¶ 107.)  When the New York team asked Madoff for documents, Madoff informed the team that he had already supplied such documents to the Washington office, a fact of which the New York team was unaware due to the offices' lack of coordination and communication, and their failure to use the SEC's internal case-tracking system.  (Id. ¶¶ 108-09.)

Even after Madoff informed the New York office of the investigation that was being conducted at the Washington office, the two offices shared relatively little information and communicated only minimally.  (Id. ¶¶ 110-11.)  Supervisors at the New York office determined that, because the Washington office had looked into similar issues, the issues must have been resolved properly, although the Washington investigation had never actually been concluded.  (Id. ¶ 112.)  In September 2005, the New York office closed its investigation and reported that all red flags had been addressed by information and documents provided by Madoff.  (Id. ¶ 113.)  Of

the investigation that resulted from the April 2004 email, the OIG Report concluded: "A compelling and credible complaint was provided with several significant red flags. However, the examination was not staffed appropriately, delayed in outset, focused in error, conducted without obtaining critical independent data, examiners were not allowed to follow up on their suspicions, and it concluded with unresolved issues remaining and with a closing report that relied too heavily on the representations of Madoff. Because of these mistakes, an opportunity to uncover Madoff's Ponzi scheme was missed." (Id. ¶ 115, quoting OIG Report at 235.)

In October 2005, Markopolos gave the SEC's Boston office another version of his report, claiming that Madoff's hedge fund was a fraud. (Id. ¶ 116.) The report provided detailed, extensive evidence that Madoff was operating a Ponzi scheme and told the SEC that Markopolos' conclusions could be confirmed by speaking with a number of other industry professionals, names and contact information for whom was included in the report. (Id. ¶¶ 117, 120.) The report was forwarded to the New York office, where it was assigned to an Enforcement team with no useful experience in conducting Ponzi scheme investigations. (Id. ¶¶ 123-24.) Much of the investigative work was done by an inexperienced, junior staff member, and the investigation was compromised by the vendetta of a supervisor against Markopolos. (Id. ¶¶ 124-28.) Miscommunication with the Broker-Dealer team, delays, misplaced priorities, and a failure to properly open and record developments in the SEC's internal case-tracking system also characterized the investigation. (Id. ¶¶ 130-32.) Despite these flaws, the investigation team managed to catch Madoff in a pattern of lies. (Id. ¶ 133.) In February 2006, the Enforcement staff reached out to the SEC's Office of Economic Analysis ("OEA") for investigative assistance, but the OEA failed to respond to the request for assistance. (Id. ¶ 134.) When the Enforcement

staff reached out a second time, it failed to provide OEA with a copy of Markopolos' 2005 complaint, and the Enforcement team never followed up.  (Id. ¶¶ 134-35.)

Despite not understanding the subjects of their own investigation, the Enforcement team did not reach out to other SEC divisions for assistance, and conducted its own sworn examination of Madoff.  (Id. ¶¶ 137-38.)  At his examination, Madoff provided evasive, inconsistent, suspicious answers to SEC inquiries, but the Enforcement team accepted at face value his explanations for his consistently high returns.  (Id. ¶ 141.)  The Enforcement team failed to verify answers Madoff had given, which would have uncovered his massive fraud.  (Id. ¶¶ 142-43.)  When a subsequent verification call was made, the inexperienced staff failed to comprehend the significance of answers that were inconsistent with Madoff's representations, and failed to ask appropriate follow-up questions.  (Id. ¶¶ 144-46.)  Despite the evidence available to the Enforcement team, the only enforcement action it took was to procure Madoff's agreement to register as an investment advisor since he had lied about his number of investment-advisory clients.  (Id. ¶¶ 150-51.)  The investigation concluded by June 2007 without resolving any of the red flags about which Markopolos had complained.  (Id. ¶ 152.)

In December 2006, the SEC received an anonymous complaint stating that Madoff was commingling customer funds with his own.  (Id. ¶¶ 154-55.)  In response, the same Enforcement team that had investigated Markopolos' third complaint called Madoff's lawyer, who denied that the investor was a Madoff client, a denial which turned out to be false.  (Id. ¶ 156.)  Without any further action or attempt to verify the lawyer's denial, the investigation was concluded.  (Id.)

In June 2007, Markopolos again contacted the SEC about Madoff.  (Id. ¶ 157.)

His email warning to the supervisor of the New York Enforcement team was ignored.  (Id.)

In March 2008, the Chairman of the SEC received a warning from the same person who had written in December 2006 regarding the commingling of funds.  (Id. ¶ 158.)  The new complaint was forwarded to the same New York Enforcement team, which told the Chairman's office that the complaint would not be pursued.  (Id. ¶ 159.)

The economic crisis of mid-2008 created a need for cash and, among Madoff's investors, a skepticism about keeping money in the market.  (Id. ¶ 160.)  Lacking new investors to compensate for these forces, Madoff's Ponzi scheme finally became unsustainable, and was disclosed to the public, in December 2008.  (Id. ¶ 161.)

The OIG Report concluded that, "despite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme.  Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the SEC could have uncovered the Ponzi scheme well before Madoff confessed."  (Id. ¶ 163, quoting OIG Report at 41.)  Plaintiffs contend that, if the SEC had performed its functions with the most basic level of competence, it would have discovered Madoff's scheme, and the losses to Plaintiffs would have been prevented.  (Id. ¶ 164.)

### DISCUSSION

Defendant argues that, because the decisions of the SEC regarding whom to investigate and how to conduct such investigations are discretionary, any negligence or abuse of that discretion is shielded from suit by sovereign immunity, and that this Court therefore lacks subject matter jurisdiction of Plaintiffs' claims.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Here, the question of whether the Court has subject matter jurisdiction of Plaintiffs' claims turns on whether the Government has waived its sovereign immunity.

Plaintiffs bring their claims against the United States pursuant to the FTCA. The FTCA, a limited waiver of sovereign immunity, provides for United States Government liability "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b)(1) (West 2006). In other words, the FTCA functions as an exception to the general prohibition on suits against the United States Government.

A discretionary function exception ("DFE") provision of the statute limits, however, the extent to which the FTCA waives sovereign immunity. The DFE excepts from the FTCA's coverage "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a) (West 2006). "[T]he DFE bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an "element of judgment or choice" and are not compelled by statute or regulation and (2) the judgment or choice in question must be

grounded in 'considerations of public policy' or susceptible to policy analysis." <u>Coulthurst v.</u>
<u>United States</u>, 214 F.3d 106, 109 (2d Cir. 2000) (citing <u>United States v. Gaubert</u>, 499 U.S. 315,
322-23 (1991) and <u>Berkovitz v. United States</u>, 486 U.S. 531, 536-37 (1988)).

Regarding the first prong, "[t]he requirement of judgment or choice is not
satisfied," and the DFE therefore does not apply, "if a 'federal statute, regulation, or policy
specifically prescribes a course of action for an employee to follow,' because 'the employee has
no rightful option but to adhere to the directive.'" <u>Gaubert</u>, 499 U.S. at 322 (quoting <u>Berkovitz</u>,
486 U.S. at 536).  Where a matter is committed to the discretion of a government actor, the
discretionary function exception bars claims based "on decisions at the policy or planning level"
as well as claims "based on day-to-day management decisions if those decisions require
judgment as to which of a range of permissible courses is wisest." <u>Fazi v. United States</u>, 935
F.2d 535, 537-38 (2d Cir. 1991).

As to the second prong, a discretionary decision is within the exception if the
judgment at issue "'is of the kind that the discretionary function exception was designed to
shield.'" <u>Gaubert</u>, 499 U.S. at 322-23 (quoting <u>Berkovitz</u>, 486 U.S. at 536).  In assessing the
second prong, "if a regulation allows the employee discretion, the very existence of the
regulation creates a strong presumption that a discretionary act authorized by the regulation
involves consideration of the same policies which led to the promulgation of the regulations." <u>Id.</u>
at 324.  Thus, "[w]hen established governmental policy, as expressed or implied by statute,
regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be
presumed that the agent's acts are grounded in policy when exercising that discretion." <u>Id.</u>  If the
applicable statute or regulation does not give the employee discretion, no presumption attaches,

and the court must determine whether the decisions were "of the kind" that are "susceptible to policy analysis." Id. at 323.  Where there is no statute, regulation, or policy on point (either conferring discretion or limiting discretion), a court must examine the nature of the actions taken and whether they are susceptible of policy analysis, rather than focus on whether the decision was in fact the result of a policy-based decision making process. Id. at 325.  Sovereign immunity and the DFE serve three core principles: separation of powers, protection of decisionmaking by government policymakers, and preservation of public revenues and property. Gray v. Bell, 712 F.2d 490, 511 (D.C. Cir. 1983), cert. denied, 465 U.S. 1100 (1984).  The DFE "is about power, not fairness." Nat'l Union Fire Ins. v. United States, 115 F.3d 1415, 1422 (9th Cir. 1997).  Thus, detrimental reliance by members of the public on assumptions that government agencies will perform regulatory functions competently is not determinative of the ability of injured citizens to seek redress against the Government in a civil action.

In opposing a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), the party invoking the Court's jurisdiction bears the burden of demonstrating that subject matter jurisdiction exists. Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003); see also APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (the party asserting jurisdiction has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists, and that showing "is not made by drawing from the pleadings inferences favorable to [that party].") (internal citation and quotation marks omitted).  In the FTCA context, because the United States, as a sovereign, is immune from all suits against it absent an express waiver of its immunity, United States v. Sherwood, 312 U.S. 584, 586 (1941), a plaintiff bears the burden of showing that the DFE does not apply to his claim. See, e.g., Welch v. United

States, 409 F.3d 646, 650-51 (4th Cir. 2005).

A complaint can survive a motion to dismiss based on lack of subject matter jurisdiction if it alleges facts that could embrace a non-discretionary decision that caused the injury and the United States does not "establish that the decision in question was grounded in questions of public policy." Coulthurst v. United States, 214 F.3d at 110-11 (2d Cir. 2000). It is a plaintiff's burden in the first instance to come forward with a complaint that adequately alleges a claim that not barred by the DFE. Id. at 111. If the Government responds by demonstrating that the action falls within a discretionary framework, a plaintiff must rebut the Government's showing sufficiently to demonstrate that there is a plausible case for non-discretionary or non-policy action in order to defeat dismissal. Id. at 110.[4]

Sufficiency of Plaintiffs' Allegations to Demonstrate Inapplicability of DFE

Plaintiffs argue that the Complaint presents four categories of allegations that fall outside of the scope of the DFE: (1) that the SEC violated provisions of its statutory mandate as

---

[4]     Plaintiffs argue that the Court should treat the Government's assertion of the DFE as an affirmative defense, thus placing on the Government the burden of proving the DFE's applicability in the first instance. In advancing this argument, Plaintiffs rely on various decisions that speak to which party bears the ultimate burden of proof with respect to the DFE. Those decisions do not, however, alter the plaintiff's obligation first to demonstrate a basis for the exercise of jurisdiction. See, e.g., Merando v. United States, 517 F.3d 160, 164 (3rd Cir. 2008) (plaintiff bears the burden of demonstrating that his claims fall within the scope of the FTCA's waiver of sovereign immunity, but the United States has the burden of proving the applicability of the discretionary function exception) (internal citations and quotations omitted); Prescott v. United States, 973 F.2d 696, 701-02 (9th Cir. 1992) ("[o]nly after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680 [the DFE] does the burden fall on the government to prove the applicability of a specific provision of § 2680") (quoting Carlyle v. United States, 674 F.2d 554, 556 (6th Cir. 1982)) (holding the same in reviewing a post-trial judgment, and stating that "[a]ny other reading of 28 U.S.C. § 1346(b) and § 2680 would conflict with the general rule that a party invoking federal jurisdiction must allege facts necessary to establish subject matter jurisdiction.").

set forth in the Securities Exchange Act of 1934 ("1934 Act") (citing Compl. ¶¶ 40, 68, 69, 75,

76, 80, 84, 92, 109, 111, 129, 134, 136, 137); (2) that the SEC violated internal policies

regarding the filing of reports and the use of its computer system (citing Compl. ¶¶ 84, 86, 109,

130, 131); (3) that the SEC acted or failed to act in ways that "likely violated formal SEC

policies" such as by failing to request materials from third parties (citing Compl. ¶¶ 35, 37, 38,

39, 40, 49, 67, 69, 70, 71, 73, 80, 83, 94, 95, 103, 104, 106, 107, 124, 125, 127, 128, 132, 138,

140, 147); and (4) "other allegations of admittedly negligent conduct that may or may not have

violated any written policies but which were nevertheless outside any permissible range of

conduct and were prohibited as a matter of practice within the SEC" (citing Compl. ¶¶ 38, 66, 76,

77, 78, 81, 91, 97, 99, 100, 102, 103, 107, 133, 134, 142, 144, 145, 146, 149).  (See Pls' Mem. of

Law in Opp. to Mot. to Dismiss 5-7.)  Plaintiffs also contend (citing Compl. ¶¶ 68, 69, 75, 76,

82, 83) that none of the conduct described above was in fact grounded in "legitimate policy

considerations."

Plaintiffs state that their "allegations of specific SEC policy violations, as well as

the absence of any legitimate policy considerations in the SEC's decision making, are based

wholly on the Government's admissions in the [OIG] Report."  (See Pls' Mem. of Law in Opp.

to Mot. to Dismiss 7.)  Plaintiffs argue that they are entitled to jurisdictional discovery because

the OIG Report lacks detailed information about what specific mandatory policies existed and

were potentially violated by the SEC.  The Court will address the sufficiency of Plaintiffs'

allegations and the Government's response to them before addressing Plaintiffs' request for

discovery.

*The SEC's Statutory Mandate*

Plaintiffs allege that the SEC violated provisions of its statutory mandate as set forth in the 1934 Act. The passages of the Complaint that Plaintiffs cite to support this argument include passages: summarizing post-hoc assessments from SEC employees concluding that investigations of Madoff were carried out in a sloppy manner and failed to comply with the dictates of common sense; describing failures of investigative teams to coordinate or communicate; describing inexplicable failures to begin or follow through with investigations; suggesting that the staff was motivated primarily by its own laziness; identifying misplaced investigative priorities; describing employees' lack of training and experience; identifying failures to open cases in the SEC's internal case tracking system; describing miscommunications between investigative teams; and noting staff members' ignorance regarding the type of conduct they were assigned to investigate.

Plaintiffs' only specific argument regarding any 1934 Act mandate contends that the SEC violated 15 U.S.C. § 78q(k)(2), which relates to the sharing of information in aid of the coordination of examinations with other examining authorities. 15 U.S.C. § 78q(k)(2) provides that "[t]he Commission and the examining authorities[5] shall share such information [regarding securities exchanges and their members, brokers and dealers, ratings organizations, and clearing agencies], including reports of examinations, customer complaint information, and other nonpublic regulatory information, as appropriate to foster a coordinated approach to regulatory

---

[5]   "For purposes of this subsection, the term 'examining authority' means a self-regulatory organization registered with the Commission under this chapter (other than a registered clearing agency) with the authority to examine, inspect, and otherwise oversee the activities of a registered broker or dealer." 15 U.S.C.A. § 78q(k)(5) (West 2009).

oversight of brokers and dealers that are subject to examination by more than one examining authority." 15 U.S.C.A. § 78q(k)(2) (West 2009).  Emphasizing the statute's use of the word "shall," Plaintiffs argue that section 78q(k)(2) imposes a mandatory obligation to share all complaint and investigative information with other agencies, and assert that their injuries are traceable to the SEC's failure to do so in connection with Madoff.  Plaintiffs ignore the portion of the statute that directs the SEC to engage in such coordination activities "as appropriate," a qualification that clearly confers discretion to determine whether, when, to what extent, and how information is to be shared in order to coordinate oversight activity.  See Dichter-Mad, 707 F. Supp. 2d at 1042-43 (concluding that the legislative history of subsection (k)(2) reveals that it is "purely discretionary" and that it is not the place of courts to second-guess how the SEC accomplishes the multiple policy goals embodied in section 78q(k)(2)).  Plaintiffs' reliance on section 78q(k)(2) to demonstrate the existence of a mandatory duty to disclose investigatory information to other authorities is thus misplaced, and they fail to allege a violation outside the scope of the DFE in this regard.

*SEC Internal Policies Regarding Reports and Computer System*

Plaintiffs argue that the SEC violated mandatory internal policies regarding the filing of reports and the use of its computer system.  The passages of the Complaint that Plaintiffs cite to support this argument refer to failures to follow protocols and the failure of investigative teams to enter reports into the SEC's STARS case-management system or check the system for existing reports.  The Court interprets this category to include all of Plaintiffs' allegations regarding various administrative case management tasks.  Plaintiffs' arguments with respect to case management are unsupported by any factual allegations identifying mandatory

duties.[6]  The characterizations proffered in Plaintiffs' Complaint notwithstanding, the

voluminous OIG Report, to which Plaintiffs' Complaint repeatedly refers, describes no

mandatory case-opening, case-management, or other administrative or investigative protocols.

Cf. 15 U.S.C. § 78u(a)(1) (permitting the SEC to decide "as it deems necessary" how to

"investigate any facts, conditions, practices, or matters," whether through "a statement in writing,

under oath or otherwise.").  Plaintiffs thus fail to proffer facts demonstrating the existence of a

non-DFE-covered claim for violation of internal policies and protocols.

### *Allegedly "Likely" Violation of Other Formal SEC Policies*

Plaintiffs also argue that the SEC acted or failed to act in various ways that "likely

violated formal SEC policies."  The Court, based on the passages of the Complaint to which

Plaintiffs refer, interprets this category to include all of Plaintiffs' allegations regarding the

SEC's hiring, training, and staffing decisions; improper personal motivations for staff members'

investigatory conduct; the failures of investigative teams to communicate or coordinate; and the

failure to verify information obtained in the course of investigations.

In connection with this allegation of "likely" violations of formal SEC policies,

Plaintiffs refer to passages of the OIG Report concluding, inter alia, that SEC staff should have

been aware of certain information, that investigative teams' actions and inactions defied common

sense, and that inexperience, interpersonal dynamics, and laziness led to missed opportunities to

expose Madoff's fraud.

---

[6]    For instance, Plaintiffs cite to Compl. ¶ 84 to support their argument that mandatory case management directives were disregarded.  However, the Complaint merely alleges that there was "a serious failure to follow appropriate protocols" and cites to a passage of the OIG Report that references no protocols whatsoever.

Scandalous and outrageous as Plaintiffs' allegations (and findings of the OIG Report on which they are based) are, Plaintiffs fail to identify any specific, mandatory duty that the SEC violated in its numerous instances of sloppy, uninformed, irresponsible behavior. Cf. Gaubert, 499 U.S. at 322. That the conduct in question defied common sense and reeked of incompetency does not indicate that any formal, specific, mandatory policy was "likely" violated. Plaintiffs have not identified any mandatory directive that requires, for instance, that a certain type of investigative team investigate a certain type of complaint, that investigative teams be staffed with employees with a certain amount of experience or level of expertise, that investigations begin within a certain window of time after a complaint is received, or that teams or offices share information or coordinate investigations in a particular way.

*Other Conduct Allegedly Outside of Any Permissible Range of Conduct*

Plaintiffs argue that their claims are also based on admittedly negligent conduct that, while it may not have violated any written policies, was nevertheless "outside any permissible range of conduct" and was prohibited as a matter of practice within the SEC. The sections of the Complaint that Plaintiffs cite to support this contention refer to instances of SEC failures to conduct investigations in a thorough manner, employee laziness, and other deficiencies in investigations.

Plaintiffs' arguments that the SEC's conduct defied common sense or violated an unwritten permissible code of conduct do not provide the necessary factual demonstration that the conduct of which they complain is not covered by the DFE. Plaintiffs are required to allege the existence of a policy that is specific and mandatory, and to identify injury arising from Government violation of such a policy. Plaintiffs' vague claims about unacceptable conduct do

not allege adequately the violation of a specific and mandatory directive or policy that would take their claims outside the scope of the DFE.

In sum, Plaintiffs have not identified any specific, non-discretionary mandate that the SEC conduct investigations under particular circumstances, or that such investigations be conducted in a particular manner. Plaintiffs' Complaint cites isolated staff statements, quoted by the OIG, that certain reports should have been made or that actions should have been recorded in particular ways, and Plaintiffs argue that common sense approaches to this important work would have dictated more regular and effective actions in all of the underlying areas. Plaintiffs also assert, without any supporting factual proffers, that no discretion was in fact exercised at key points of the SEC's interactions with and investigations of Madoff.

The boundaries of the DFE are not, however, delineated by best practices or even the absence of logical, responsible practices. Claims escape its scope only where the injury-producing government action was specifically non-discretionary, or where a discretionary action that caused injury was not one that was susceptible to policy analysis. Gaubert, 499 U.S. at 322-23; Berkovitz, 486 U.S. at 536-37. Here, Plaintiffs fall short of meeting their initial burden of demonstrating that their injuries could have arisen from the negligent violation of a non-discretionary duty. See Coulthurst, 214 F.3d at 110-11. Plaintiffs proffer no non-conclusory factual allegations identifying non-discretionary duties. Cf. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Plaintiffs fail to identify any non-discretionary statutes, regulations, or rules that were violated.

Furthermore, their injury arises from the scope, manner, and results of investigative activity, which is inherently discretionary and policy-driven, rather than from

individual failures to perform specific tasks competently. The Complaint identifies the failure to

uncover and stop Madoff as the proximate cause of Plaintiffs' harm. Plaintiffs' sole cause of

action – sounding in negligence – attributes their injury to the SEC's failure to oversee, expose,

and end Madoff's fraud.[7] However, despite Plaintiffs' aggressive reading of the OIG Report, the

Complaint never identifies a duty imposed on the SEC to conduct its investigations in a

particular way. In the absence of allegations demonstrating relevant mandatory obligations, the

Court presumes that the challenged acts and omissions are discretionary and not amenable to suit.

Ignatiev, 238 F.3d at 466-67 (citing Gaubert, 499 U.S. at 324-25).[8]

---

[7]   Plaintiffs' reliance on Coulthurst in arguing the sufficiency of their Complaint is
      misplaced. Whereas in Coulthurst, the direct instrument of injury was the collapse
      of prison exercise equipment and there was an open factual question as to whether
      the collapse was due to failure to follow a specific maintenance or inspection
      mandate or a more general failure to establish an appropriate policy for maintenance
      and oversight, the claim of injury here stems from the SEC's failure to either take
      actions itself or communicate sufficient information to other organizations to
      prompt them to act. The quotidian failures alleged (e.g., incorrect staffing,
      incompetent handling of information and reporting) were elements of the
      background against which SEC made bad decisions (or failed to exercise its
      investigative authority). Unlike the pleading in Coulthurst, therefore, the Complaint
      provides no factual framework that, read in light most favorable to Plaintiffs, could
      embrace a non-discretionary, non-policy decision that caused injury. See also Sloan
      v. United States Dep't of Housing and Urban Dev., 236 F.3d 756, 761-62 (D.C. Cir.
      2001) (rejecting an FTCA challenge to an underlying investigation and audit
      because the underlying conduct caused no harm distinct from the ultimate,
      discretionary prosecutorial decision which relied on the investigation); Fisher Bros.
      Sales, Inc. v. United States, 46 F.3d 279, 282 (3rd Cir. 1995) (rejecting FTCA
      plaintiffs' attempt to circumvent the DFE by targeting the negligence of lab
      technicians on whose research the FDA relied in banning Chilean fruit bound for the
      United States, holding that plaintiffs' injury was caused by decisions susceptible to
      policy analysis and made within the discretion afforded the FDA Commissioner); cf.
      Freeman, 556 F.3d at 339 (collecting FTCA cases holding that ostensibly mandatory
      responsibilities often require, or are embedded in a framework premised on,
      discretion such that the DFE applies).

[8]   Cf. Treats Intern. Enters., Inc. v. Sec. and Exch. Comm'n, 828 F. Supp. 16, 18
      (S.D.N.Y. 1993) (finding no judicially manageable standard for judging when or

Government's Demonstration of Discretionary Framework

        If a plaintiff "fairly alleges negligence outside the scope of the DFE," the

Government must establish that "an activity is not mandated by statute and involves some

element of judgment or choice" and that the decision in question was susceptible to policy

analysis. Coulthurst, 214 F.3d at 111, 110. In its motion papers, the Government demonstrates

that, contrary to the allegations in the Complaint, the SEC's investigatory powers are

discretionary. Here, Plaintiffs have not plead facts showing that the challenged conduct is

outside the DFE, and the Government has, in its motion, demonstrated that the conduct is indeed

covered by the DFE.

        The 1934 Act and the SEC's own regulations define the SEC's investigative and

enforcement powers as permissive and discretionary. The 1934 Act provides, inter alia, that:

> The Commission may, in its discretion, make such investigations as it deems
> necessary to determine whether any person has violated, is violating, or is about to
> violate any provision of this chapter . . . The Commission is authorized in its
> discretion, to publish information concerning any such violations, and to
> investigate any facts, conditions, practices, or matters which it may deem
> necessary or proper to aid in the enforcement of such provisions . . . [,]

15 U.S.C.A. § 78u(a)(1) (West 2009) (emphasis supplied), and that

> Whenever it shall appear to the Commission that any person is engaged or is
> about to engage in acts or practices constituting a violation of any provision of
> this chapter . . . it may in its discretion bring an action in the proper district court
> . . . to enjoin such acts or practices, and upon a proper showing a permanent or
> temporary injunction or restraining order shall be granted without bond. The
> Commission may transmit such evidence as may be available concerning such
> acts or practices . . . to the Attorney General . . . [,]

15 U.S.C.A. § 78u(d)(1) (West 2009) (emphasis supplied). The SEC's regulations provide that:

---

      how the SEC should use its investigatory discretion).

> Where, from complaints received from members of the public, communications
> from Federal or State agencies, examination of filings made with the Commission,
> or otherwise, it appears that there may be violation of the acts administered by the
> Commission or the rules or regulations thereunder, a preliminary investigation is
> generally made.  In such preliminary investigation no process is issued or
> testimony compelled.  The Commission may, in its discretion, make such formal
> investigations and authorize the use of process as it deems necessary to determine
> whether any person has violated, is violating, or is about to violate any provision
> of the federal securities laws or the rules of a self-regulatory organization of
> which the person is a member or participant.  Unless otherwise ordered by the
> Commission, the investigation or examination is non-public and the reports
> thereon are for staff and Commission use only.

17 C.F.R. § 202.5(a) (2010) (emphasis supplied).  The regulations further provide that

> After investigation or otherwise the Commission may in its discretion take one or
> more of the following actions: Institution of administrative proceedings looking to
> the imposition of remedial sanctions, initiation of injunctive proceedings in the
> courts, and, in the case of a willful violation, reference of the matter to the
> Department of Justice for criminal prosecution.  The Commission may also, on
> some occasions, refer the matter to, or grant requests for access to its files made
> by, domestic and foreign governmental authorities or foreign securities
> authorities, self-regulatory organizations such as stock exchanges or the National
> Association of Securities Dealers, Inc., and other persons or entities.

17 C.F.R. § 202.5(b) (2010) (emphasis supplied).  These statutes and regulations give rise to a

"strong presumption" that the conduct at issue was based in public policy.  See Gaubert, 499 U.S.

at 324.  In light of this statutory and regulatory language, the courts have "unanimously" rejected

challenges to the SEC's use of its investigatory or enforcement powers.  Dichter-Mad, 707 F.

Supp. 2d at 1036-39 (collecting cases).

        The Government has thus proffered regulations and statutory authority

demonstrating that the proximate cause of Plaintiffs' injury – the SEC's ultimate non-

intervention – was within the scope of activity clearly committed to SEC discretion.  The DFE

applies when "discretion intervenes between an alleged government wrongdoer and the harm

suffered by a plaintiff," even if the wrongdoer violated a mandatory duty.  General Dynamics

Corp. v. United States, 139 F.3d 1280, 1285 (9th Cir. 1998).  The General Dynamics court held

that a plaintiff cannot avoid the DFE's protection of prosecutorial conduct by targeting

underlying conduct.  The existence of intervening discretion between the underlying disregard of

a mandatory duty and a plaintiff's injury defeats an attempt to artfully plead around the DFE.  Id.

at 1283-84.  Here, Plaintiffs have failed to identify any underlying disregard of a mandatory duty,

and, even if they had, it would have been necessary for the SEC, in its discretion, to decide how

to proceed had the underlying investigative conduct yielded different information or conclusions.

Susceptibility to Policy Analysis

With respect to the second prong of the Gaubert/Berkovitz standard, Plaintiffs

contend that none of the conduct of which they complain was grounded in "legitimate policy

considerations."  Indeed, Plaintiffs refer to findings in the OIG Report that investigative action

and inaction was undertaken based on jealousy, secrecy, laziness, inexperience, and, in some

instances, for reasons that are to this day inexplicable.  However, the proper "focus of the inquiry

is not on the agent's subjective intent in exercising the discretion conferred by statute or

regulation, but on the nature of the actions taken and on whether they are susceptible to policy

analysis."  Gaubert, 499 U.S. at 325.  The individual actors' motivations are thus insufficient to

defeat the DFE.  The Court looks, instead, at the general nature of the conduct at issue.  The

conduct at issue here clearly relates to discretionary decisions that are susceptible to policy-based

analysis – e.g., following one lead versus another, deciding which complaints to pursue and how.

Courts are ill-suited to oversee the decisions of the SEC precisely because of their inherent

policy-oriented nature, often involving considerations of resource allocation and opportunity

costs.  See Bd. of Trade of Chicago v. SEC, 883 F.2d 525, 531 (7th Cir. 1989).  The DFE

protects the agency's ability to exercise properly the full scope of its discretion by insulating

from civil litigation even those discretionary decisions that were, improperly, actually made for

inappropriate reasons. Indeed, the DFE expressly provides that it applies to claims "based upon

the exercise or performance <u>or the failure to exercise or perform a discretionary function or duty</u>

on the part of a federal agency or an employee of the Government <u>whether or not the discretion</u>

<u>involved be abused</u>." 28 U.S.C.A. § 2680(a) (West 2006) (emphasis supplied).

The Court also recognizes that the FTCA's legislative history indicates that, when

drafting and debating the statute, members of Congress repeatedly indicated that the DFE was

intended to apply to the SEC. <u>See United States v. S.A. Empresa De Viacao Area Rio Grandense</u>

<u>(Varig Airlines)</u>, 467 U.S. 797, 809-10 (1983) (noting that, when Assistant Attorney General

Francis M. Shea appeared before the House Committee and described the discretionary function

exception as "highly important," he stated that "[The DFE is] designed to preclude application of

the act to a claim based upon an alleged abuse of discretionary authority by a regulatory or

licensing agency-for example, the . . . Securities and Exchange Commission. . . . It is neither

desirable nor intended that the . . . the propriety of a discretionary administrative act should be

tested through the medium of a damage suit for tort."); <u>Dalehite v. United States</u>, 346 U.S. 15,

29, n.21 (1953) (legislative record illustrates that the DFE was explicitly designed to preclude

suit against the SEC).

<u>Plaintiffs' Request for Jurisdictional Discovery</u>

A party seeking jurisdictional discovery, like a party seeking other kinds of

discovery, bears the burden of showing necessity. When a plaintiff in an FTCA suit alleges facts

showing sufficient reason to believe mandatory guidelines have been disregarded, but that such

guidelines are unknown or unknowable without discovery, courts have granted jurisdictional

discovery. <u>See Ignatiev</u>, 238 F.3d at 467.  A plaintiff is not, however, entitled to jurisdictional

discovery if it cannot show that the requested discovery is "likely to produce the facts needed to

withstand a Rule 12(b)(1) motion." <u>Freeman</u>, 556 F.3d at 342-43 (collecting cases and holding

that this rule is particularly apt in the context of a FTCA suit where a plaintiff is "attempting to

disprove the applicability of an immunity-derived bar to suit because immunity is intended to

shield the defendant from the burdens of defending the suit, including the burdens of discovery")

(citing <u>Williamson v. United States Dep't of Agric.</u>, 815 F.2d 368, 382 (5th Cir. 1987)).

In <u>Ignatiev</u>, where the claim arose from alleged failures of the Secret Service to

provide appropriate protection for a foreign embassy, the plaintiff demonstrated, based on a

specific passage in the United States Code, that there was reason to believe relevant mandatory

guidelines existed, because the Secret Service's statutory mandate made specific mention of

performing duties as may be "prescribe[d]." <u>Id.</u>  Because the very nature of the Secret Service's

mission leads logically to confidentiality of the rules and duties that govern its conduct, plaintiffs

would "have no way to know what mandatory policies may bind the Secret Service." 238 F.3d at

467.  Here, by contrast, Plaintiffs have identified no statutory or regulatory provision that

suggests the existence of prescriptive rules for the conduct of SEC investigations, and there is no

reason to believe that information concerning any such duties would not be publicly available.

Indeed, the public availability of the extensive OIG Report upon which Plaintiffs rely heavily,

and of the SEC's current Enforcement Manual, suggest that Plaintiffs are not likely to uncover

hidden mandatory rules through discovery.

Plaintiffs' request for jurisdictional discovery is, accordingly, denied.[9]

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss the Complaint is granted. This Opinion and Order resolves docket entry no. 5. The Clerk of Court is respectfully requested to enter judgment dismissing the Complaint for lack of subject matter jurisdiction and

---

[9]    Plaintiffs also request that the Court convert the instant motion into one for summary judgment because the facts relating to jurisdiction are intertwined with the facts relevant to the underlying merits. In light of the Court's determinations regarding jurisdictional discovery and the parties' respective burdens in connection with this motion practice, this request is also denied.

Plaintiffs also argue that they are entitled to jurisdictional discovery because their Freedom of Information Act ("FOIA") request was improperly rebuffed. Plaintiffs' contend that the SEC improperly objected to the request on the bases of overbreadth and the law enforcement exemption to FOIA. <u>See</u> Pls.' Sur-Reply Mem. of Law in Opp. to Def.'s Mot. to Dismiss 8; Decl. of Howard R. Elisofon in Supp. of Pls.' Opp. to Def.'s Mot. to Dismiss ("Elisofon Decl.") Ex. C. The SEC's overbreadth objection was made in response to Plaintiffs' request for a broad range of materials that encompassed potential policies (<u>see, e.g.</u>, Elisofon Decl. Ex. A at 2, seeking from the SEC, <u>inter alia</u>, "Any written communications or documents concerning any manuals, policies, procedures, practices, rules, regulations, directives, orders, instructions or customs concerning the conduct by the SEC of audits, inquiries or other investigations of broker/dealers, investment advisory firms, or hedge funds."). The SEC's law-enforcement privilege objection appears to have been made in response to Plaintiffs' request for specific Madoff-related investigation files (<u>see</u> Elisofon Decl. Ex. B).

Whatever merit Plaintiffs' arguments may have with respect to FOIA compliance, however, Plaintiffs have not made the showing necessary to warrant jurisdictional discovery in this action. Given the nature of the SEC's mission and public disclosures of materials, its objections to Plaintiffs' FOIA requests are insufficient to demonstrate that any relevant policies are unknown and unknowable without discovery. <u>Cf. Ignatiev</u>, 238 F.3d at 467.

close this case.

SO ORDERED.

Dated: New York, New York
        April 19, 2011

LAURA TAYLOR SWAIN
United States District Judge